UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOSE AGEO LUNA VANEGAS,
GUADALUPE NALLELY,
on behalf of themselves and all
others similarly situated,

      Plaintiffs,

v.

SIGNET BUILDERS, INC., et al.,

      Defendants.

PLAINTIFFS' MEMORANDUM
IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT


Case No. 21-cv-54

---

**TABLE OF CONTENTS**

FACT SUMMARY..............................................................................................................2

ARGUMENT .................................................................................................................... 3

    I.   Summary Judgment Standard ............................................................................. 3

    II.  Plaintiffs Were Not Agricultural Workers. ........................................................ 4

        A.  The Definition of Agriculture ................................................................... 4

        B.  In the Modern Economy Agricultural Construction Is a Separately Organized and Independent Productive Activity ........................................................... 6

        C.  DOL Regulations Confirm That Plaintiffs' Work Was Not Secondary Agriculture..... 7

            1.  Signet Builder's Work Was Not An Established Part of Agriculture ................... 8

            2.  Signet's Work Was Not Subordinate to the Farming Operations ...................... 13

            3.  Signet's Work Amounted to an Independent Business ..................................... 14

    III.  Defendants' Sixth Affirmative Defense Cannot Be Supported........................................ 22

    IV.  Plaintiffs Are Contractually Entitled to the Prevailing Wage for Non-Agricultural Construction Work. ................................................................................. 23

    V.  Alternatively Plaintiffs Are Entitled to the Non-Agricultural Prevailing Wage in *Quantum Meruit* .................................................................................. 26

    VI.  Plaintiffs' Regular Rates for Purposes of Calculating Their FLSA Overtime Damages Are the Prevailing Rates Set Forth in Fact 83 & 84 ............................... 27

CONCLUSION................................................................................................................ 27

i

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*A.H. Phillips v. Walling,*
   324 U.S. 490 (1945) ...................................................................................................... 5

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ...................................................................................................... 3

*Bayside Enterprises v. NLRB,*
   429 U.S. 298 (1977) .................................................................................................... 21

*Bills v. Cactus Family Farms LLC.,*
   5 F.4th 844 (8th Cir. 2021) .......................................................................................... 9

*Boyls v. Wirtz,*
   352 F.2d 63 (5th Cir. 1965) .......................................................................................... 9

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .................................................................................................... 22

*Farmers Reservoir & Irrigation Co. v. McComb,*
   337 U.S. 755 (1949) ............................................................................................ *passim*

*Frederick County Fruit Growers,*
   968 F.2d (D.C. Cir. 1994) ........................................................................................... 26

*Holly Farms Corp. v. NLRB,*
   517 U.S. 392 (1966) ............................................................................................ *passim*

*Jimenez v. Duran,*
   287 F.Supp.2d 979 (N.D. Iowa 2003) .......................................................................... 9

*Johnson v. Pelker,*
   891 F.2d 136 (7th Cir. 1989) ........................................................................................ 3

*Kirschbaum Co. v. Walling,*
   316 U.S. 517 (1942) .................................................................................................... 11

*Luna Vanegas v. Signet Builders, Inc,*
   46 F.4th 636 (7th Cir. 2022) ................................................................................ *passim*

*Maneja v. Waialua Agr. Co.,*
   349 U.S. 254 (1955) ............................................................................................ 9, 11, 15

*Mencia v. Allred,*
  808 F.3d 463 (10th Cir. 2015)..................................................................................... 26

*Mitchell v. Budd,*
  350 U.S. 473 (1956) ............................................................................................. 10, 11

*N.L.R.B v. Monterey Co. Bldg. and Const. Trades Council,*
  335 F.2d 927 (9th Cir. 1964)............................................................................. 7, 12, 16

*Osceola Farms v. Wirtz,*
  372 F.2d 584 (5th Cir. 1967)................................................................................... 9, 11

*Sariol v. Florida Crystals Corp.,*
  490 F.3d 1277 (11th Cir. 2007)...................................................................................... 9

*Sarver v. Experian Info. Sols.,*
  *390* F.3d 969 (7th Cir. 2004)......................................................................................... 3

**Statutes**

8 U.S.C. §1101.................................................................................................................. 23

8 U.S.C. § 1188(a) ...................................................................................................... 23, 25

29 U.S.C. § 203...................................................................................................... *passim*

29 U.S.C. § 213................................................................................................................... 3

29 U.S.C. § 259............................................................................................................ 1, 22

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................... 3

**Regulations**

8 C.F.R. § 214.2 ............................................................................................................... 23

20 C.F.R.§ 653.501 .......................................................................................................... 24

20 C.F.R. § 655.135 ......................................................................................................... 24

20 C.F.R. § 655 Part A and Part B ................................................................................... 23

20 C.F.R. § 655.10 (2015) ............................................................................................... 25

20 C.F.R. § 655.121 (2010) ............................................................................................. 23

20 C.F.R. § 655.122 (2010) .................................................................................. 24

20 C.F.R. §655.182 (2010) ................................................................................... 25

29 C.F.R. Part 780 ................................................................................................... 8

29 C.F.R. § 778.5 ........................................................................................ 1, 27, 28

29 C.F.R. § 780.104 ................................................................................................. 5

29 C.F.R. § 780.129 ............................................................................................... 13

29 C.F.R. § 780.143 .......................................................................................... 14, 20

29 C.F.R. § 780.144 ...................................................................................... 8, 14, 22

29 C.F.R. § 780.145 ............................................................................................... 15

## Other Authorities

81 Cong. Rec. 7653 ................................................................................................. 8

Now come Plaintiffs Jose Luna Vanegas and Guadalupe Nallely (on behalf of Jose Garcia Gonzalez, deceased) (hereafter collectively "Plaintiffs") and file this brief in support of their motion for partial summary judgment.[1] Plaintiffs are construction workers who were employed by Defendant Signet Builders, Inc. to help erect the shells of animal confinement buildings. Plaintiffs seek partial summary judgment in their favor (1) on Defendants' fourth affirmative defense that Plaintiffs' construction work was overtime exempt agricultural work; (2) on Defendants sixth affirmative defense that Plaintiffs' FLSA claims are barred by 29 U.S.C. §259; (3) on Plaintiffs contract claim (Count II) that they were contractually entitled to receive the prevailing wage applicable to foreign workers performing non-agricultural construction work; or, alternatively, (4) on Plaintiffs *quantum meruit* claim (Count III) that, if their contract did not offer the prevailing wage, the contractual wage term was void as against public policy, entitling Plaintiffs to a reasonable wage, which wage cannot be less than the minimum wage required by law for their non-agricultural work-- i.e. the prevailing wage applicable to foreign non-agricultural workers, and (5) that Plaintiffs are entitled to have their FLSA overtime damages calculated at time-and-one-half the applicable DOL prevailing rates for all hours they worked over 40 (minus what they were paid for those hours) pursuant to 29 C.F.R. §778.5.

Plaintiffs also seek partial summary judgment as to the specific prevailing wage rates applicable to their non-agricultural work whether those wages are awarded by contract or *quantum meruit.*

---

[1] The parties have stipulated that any determination of liability in favor of Plaintiffs Luna Vanegas and Garcia Gonzalez will apply with equal force to opt-ins not barred by limitations. Doc 200. In addition, they have stipulated that all Defendants will be jointly liable if there is a finding of liability against any one of the corporate defendants. Doc 195, 196. Accordingly, this motion for partial summary judgment focuses on Signet Builders, Inc.'s liability to the two named Plaintiffs. A finding that Signet Builders Inc. is liable to the two named plaintiffs will resolve all liability issues in the case.

## FACT SUMMARY

Signet Builders, Inc. employed Plaintiffs to work on construction projects on four farms in 2018 and 2019. Fact 9, 10. Those projects involved erecting the shells of prefabricated or pre-engineered metal and post-and-beam buildings or making additions to such buildings. Fact 12, 17, 23, 28, 31, 36, 52. After Signet Builders finished its work and other contractors completed the buildings, they were intended to be used to house livestock and poultry. Fact 53. All of Signet Builders work on these projects was performed as a sub-contractor or sub-sub-contractor for other construction contractors. Fact 11-14, 15-20, 21-26, 27-32, 33-38.  It had no contractual agreement with any of the farms that commissioned the projects on which Plaintiffs worked. Fact 39.  Signet Builders submitted its invoices to the contractors that hired it, i.e. Signet Construction Inc. or Signet Construction LLC, and was paid by those contractors, not by the farms. Fact 42.   Signet Builders and/or the contractors it worked for were contractually required to provide all  labor and the supervision for their scope of work.  Fact 44-48.  Farm employees at two of the farms, monitored  the work of their contractors and sub-contractors and held regular job-site meetings to ensure the work was being performed according to plan, but supervision of Signet's workers was the contractual responsibility of Signet Builders workers and/or the contractors that it worked for. Fact 46, 49. Although Signet Builders claimed its workers, including Plaintiffs, were overtime exempt, the general contractors on three of the farms where Plaintiffs worked paid their hourly workers FLSA overtime for hours over 40, Fact 62, and the fourth farm requires its contractors to pay overtime. Fact 63.

Signet Builders work contracts with Plaintiffs promised that Signet would comply with all applicable federal employment-related laws. Fact 77-81. Federal law requires that foreign visa

workers performing non-agricultural work must be paid no less than the prevailing wage set by the DOL's Occupational Wage and Employment Survey, ("OES"). Fact 84-87.

**ARGUMENT**

**I.       Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a).  Material facts are facts that are outcome determinative under applicable law. *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir. 1989).  Disputes regarding non-determinative facts do not preclude summary judgment. *Id.* In ruling on a motion for summary judgment, the Court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  Summary judgment will not be granted unless "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Sarver v. Experian Info. Sols.,* 390 F.3d 969, 970 (7th Cir. 2004).

Signet Builders admits it was an enterprise engaged in commerce or production of goods for commerce as defined by 29 U.S.C. §203(s), Fact 3, entitling its employees, including Plaintiffs, to the protections of the FLSA. It did not pay overtime based solely on its claim that Plaintiffs were employees "employed in agriculture" exempt from overtime pursuant to 29 U.S.C. §213(b)(12). Fact 8. Thus, the sole issue with respect to Plaintiffs' overtime claim, and the predicate issue with respect to their contract/*quantum meruit* claim, is whether Plaintiffs were employed in "agriculture" as defined by 29 U.S.C. §203(f).  No outcome determinative fact regarding the nature of Plaintiffs' employment is in dispute as Plaintiffs' motion is largely based on Defendants' own testimony, documents, and discovery responses, along with the testimony of

the contractors that hired Signet Builders.[2]  Because there are no genuinely disputed material facts regarding the nature of Plaintiffs' employment, the question whether their work was, or was not, agricultural presents a legal issue that is appropriately resolved on summary judgment.

**II.      Plaintiffs Were Not Agricultural Workers.**

      **A.      The Definition of Agriculture**

The FLSA defines "agriculture" for purposes of the overtime exemption to include:

> **[1]** farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and **[2]** any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C.§203(f). This definition covers two types of agricultural activities: "Primary agriculture" (marked as [1] above), and "secondary agriculture" (marked as [2] above). *Holly Farms Corp. v. NLRB,* 517 U.S. 392, 398 (1966); *Luna Vanegas v. Signet Builders, Inc,* 46 F.4th 636, 641 (7th Cir. 2022). Defendants concede that Plaintiffs were not engaged in primary agriculture. Fact 54-57. They claim, instead, that Plaintiffs' construction work fell within the definition of secondary agriculture, that is, that their work was performed as an "incident to or in conjunction with" the "farming operations" on the farms where their construction work took place. 29 U.S.C. §203(f). *Luna Vanegas,* 46 F.4th at 641.  The question presented is whether the fact that a farm would eventually raise livestock or poultry in the buildings on which Plaintiffs worked once Signet Builders finished its work and after other contractors had completed constructing the buildings, is sufficient to make Plaintiffs' work incident to or conjoined with the farm's farming activity of

---

[2] Plaintiffs also rely upon the testimony of their two expert witnesses; Plaintiffs do not rely on any testimony or declarations from the Plaintiffs.

raising livestock and poultry in those buildings.

In answering that question, it is critical to keep in mind the Supreme Court's recognition that what constitutes secondary agriculture changes over time:

> There are a host of incidental activities which are necessary to [the] process [of planting, growing and harvesting crops].  Whether a particular type of activity is agricultural depends, in large measure, upon the way in which that activity is organized in a particular society . . . In less advanced societies the agricultural function includes many types of activity which, in others, are not agricultural. The fashioning of tools, the provision of fertilizer, the processing of the product, to mention only a few examples, are functions which, in some societies, are performed on the farm by farmers as part of their normal agricultural routine. Economic progress, however, is characterized by a progressive division of labor and separation of function. Tools are made by a tool manufacturer, who specializes in that kind of work and supplies them to the farmer. The compost heap is replaced by factory produced fertilizers . . . In this way functions which are necessary to the total economic process of supplying an agricultural product become, in the process of economic development and specialization, separate and independent productive functions operating in conjunction with the agricultural function but no longer a part of it.

*Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 760-761 (1949). *See also Luna Vanegas,* 46 F.4th at 642-643 (same). Given the evolving nature of agriculture, the Court concluded that **"[t]he question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations. The question is whether the activity in the particular case is carried on *as part of the agricultural function* or *is separately organized as an independent productive activity.*"** *Farmers Reservoir,* 337 U.S. at 761 (emphasis added); 29 C.F.R. §780.104. The Supreme Court has also recognized that, in adopting the exemption for secondary agriculture, Congress intended "to create a slim exemption from the encompassing protections the NLRA and the FLSA afford employees in our Nation's commercial enterprises." *Holly Farms,* 517 U.S. at 399 n.6.  This is different from courts construing an exemption narrowly simply because of the FLSA's "humanitarian and remedial purpose," *see A.H. Phillips v. Walling,*

5

324 U.S. 490, 493 (1945), something rejected by *Encino Motor Cars v. Navarro,* 579 U.S.___ (2016). Rather it is a recognition that, in adopting the secondary agriculture exemption, Congress intended it to be narrow -- a "slim exemption" -- and it should be interpreted with that fact in mind.

**B.    In the Modern Economy Agricultural Construction Is a Separately Organized and Independent Productive Activity**

As farms have consolidated and increased in size over the past 50 years, animal confinement structures have increased in size as well. Fact 64-65. The size and complexity of these buildings now necessitates the use of professional engineering and construction crews with the knowledge, skill and ability to design and erect these buildings in a manner that ensures their structural integrity. Facts 66. As a result of these changes in the nature of farms and farm construction, an entire industry of independent of construction contractors and sub-contractors has grown up to provide farm construction services. Fact 67-69. All four of the farms where Plaintiffs worked relied on independent construction companies to erect their farm buildings. Facts 11-14 (Christensen Farms); 15-20 (Greenwillow Dairy); 21-32 (Daybreak Foods); 33-38 (Natural Prairie Dairy).  The division of labor in the farm construction industry has become so specialized that companies like Signet Builders work as sub-contractors or sub-sub-contractors on construction jobs.  As a result, they have become farther and farther removed from any connection to the operator of the farm where they work. Signet Builders had no business relationship with any of the farms where it constructed building shells.  It was a sub-contractor on the Christensen Farms projects, Facts 13-14, a sub-sub-contractor on the Daybreak projects, Facts 22-27, 31-32, and a sub-sub-sub-contractor on the Greenwillow and Natural Prairie projects. Facts 16-20-, 34-37. Because agricultural construction involves the same skills, materials, tools, technologies and equipment as non-agricultural construction -- whether it is performed on a farm or off, Ex. 51 (Rept. D. Bohnhoff Opinion 7); Fact 71, many of the companies that perform construction on

6

farms, including several of the general contractors on the jobs where Plaintiffs worked, also work on non-agricultural construction projects. Fact 71.

As a result of this progressive division of labor and separation of function between farmers and construction companies, agricultural construction has "become, in the process of economic development and specialization, [a] separate and independent productive function **operating in conjunction with the agricultural function but no longer a part of it**." *Farmers Reservoir,* 337 U.S. at 36 (emphasis added). That was the Ninth Circuit's conclusion over half a century ago, in the only case to have addressed whether construction work on a farm is agriculture. *N.L.R.B v. Monterey Co. Bldg. and Const. Trades Council*, 335 F.2d 927, 931 (9th Cir. 1964) (to view construction of farm buildings as agricultural work would not be "consistent with the realities of our modern economy." Companies performing such work "are engaged in a productive activity which is independent from any farming poultry operations. . ."). Signet Builders' work is indistinguishable from the non-agricultural work of the construction companies in *Monterey Co. Bldg and Const. Trades.* Like those companies, Signet Builders construction work was completely divorced from any actual farming activity -- i.e. the raising of livestock and poultry. It was hired by and worked for construction companies, not farmers. It had no contractual relations with any farm. For all of these reasons, *Farmers Reservoir & Irrigation Co* compels the conclusion that Plaintiffs' work for Signet Builders was non-agricultural work: It was a "separate and independent productive function[], operating in conjunction with the agricultural function, but no longer a part of it."[3] *Id.,* 337 U.S. at 760.

     C.     **DOL Regulations Confirm That Plaintiffs' Work Was Not Secondary Agriculture**

---

[3] The non-agricultural nature of the construction work Signet Builders did also explains why the general contractors on the jobs where Plaintiffs worked paid FLSA overtime to their hourly workers. Fact 62-63.

The DOL Wage Hour Administrator has issued regulations interpreting the agricultural exemption. 29 C.F.R. Part 780. Because the statutory definition of agriculture is ambiguous and the Wage Hour Administrator is the one responsible for administering the FLSA, courts routinely rely on DOL's regulations in applying the agricultural exemption. *Holly Farms, Inc.,* 517 U.S. at 405-406 (relying on DOL regulations); *Luna Vanegas,* 46 F.4th at 641 (looking to DOL regulations as guidance for interpreting the statute). Those regulations make clear that work qualifies as secondary agriculture "'only if it [a] constitutes an established part of agriculture, [b] is subordinate to the farming operations involved, and [c] does not amount to an independent business.' 29 C.F.R. §780.144. All three conditions must be met before an employer will qualify for the exemption." *Luna Vanegas,* 46 F.4th. at 641.

As explained below, the work performed by Plaintiffs does not satisfy any one of these criteria, let alone all three, compelling the conclusion that Signet Builders' sub-contract construction work on farm buildings was <u>not</u> secondary agricultural work.\

### 1. Signet Builder's Work Was Not An Established Part of Agriculture

Plaintiffs have found no cases defining the phrase "an established part of agriculture" as used in DOL's regulations. However a review of the wide-range of cases that have considered whether the activities of non-farmers fall within the definition of secondary agriculture demonstrates that, in order for a non-farmer's work to be an "established part of agriculture," the non-farmers work must either (1) involve a primary agricultural activity as defined by the statute -- i.e. raising poultry and livestock or cultivating, harvesting and transporting crops, or (2) directly and contemporaneously support a primary agricultural activity. The best example of the former is the threshing of wheat by independent companies, the principal example of secondary agriculture cited by Congress when the exemption was adopted. *See* 81 Cong. Rec. 7653 (1937). Threshing is

8

harvesting, a primary agriculture activity, whether done by a farmer or an independent company. Other examples of activities that are considered secondary agriculture because they involve performance of a primary agricultural task include *Maneja v. Waialua Agr. Co.,* 349 U.S. 254, 260-262 (1955) (workers who haul the farm's cane to the mill are delivering crops to market or storage--an activity explicitly defined as agricultural in the statute);[4] *Boyls v. Wirtz,* 352 F.2d 63 (5th Cir. 1965) (spraying pesticides on growing crops is an aspect of cultivation, a primary agricultural activity); *Jimenez v. Duran,* 287 F.Supp.2d 979 (N.D. Iowa 2003) (vaccinating and caring for poultry is part of raising poultry, a primary agricultural function).

Examples of activities that are considered secondary agriculture because they directly and contemporaneous support a primary agricultural activity include repairing farm equipment that is being used to carry workers to the fields and transport cane from the fields*, see Osceola Farms,* 372 F.2d at 590, refueling of harvest equipment in the fields during harvest, *see Sariol v. Florida Crystals Corp.,* 490 F.3d 1277 (11th Cir. 2007), monitoring the loading of pigs on trucks where such monitoring was "simultaneous to and concomitant with the independent contract growers' loading processes during their ongoing pig-raising obligations" -- i.e. where the loading was a part of pig-raising, a primary agricultural task, *see Bills v. Cactus Family Farms LLC.*, 5 F.4th 844, 849 (8th Cir. 2021), and transportation of meals to the fields to feed workers engaged in harvesting. *See Osceola Farms,* 372 F.2d at 589 & n.4. Repair work, refueling, and serving meals are not primary agriculture activities, but in each of these cases, the work at issue directly and contemporaneously supported an on-going primary agricultural activity, either harvesting or raising of livestock.

---

[4] *See Osceola Farms v. Wirtz,* 372 F.2d 584, 588 (5th Cir. 1967) (explaining that *Maneja* analyzed the transportation of cane as a question of secondary agricultural).

That secondary agricultural work must either involve primary agricultural activity or be directly and contemporaneously supportive of a farm's primary agricultural work arises from the statutory requirement that the activity be conjoined with or incident to "*such farming operations*"--i.e. the primary agricultural activity of the farm where the work is performed. 29 U.S.C. §203(f). If an activity is not directly conjoined with a farm's on-going farming activity, it cannot be secondary agriculture. That was made clear in the Supreme Court's *Holly Farms* decision. That case addressed the question whether the work of chicken catchers who enter chicken coops to catch the chickens so that they can be hauled to the processing plant is incident to or in conjunction with the chicken farm's farming activity -- i.e. raising of poultry. The Court found the NLRB's focus on the statutory words "*such* farming operations" and the need for an activity to be conjoined with those operations reasonable and, accordingly, held that chicken catching was <u>not</u> secondary agriculture because the farm's primary farming operations -- raising poultry -- had ended as soon as the chicken catchers started their work. *Holly Farms,* 517 U.S. at 402-404. In that situation, the chicken catching, although vital to the success of the farm, could not be viewed as incident to or conjoined with the farm's farming operation of *raising* chickens because it occurred after that agricultural activity had ended. The fact that the catching occurred *immediately* after the raising chickens ended did not matter. Once the farm's primary farming activity had ended, chicken catching could not be a part of "such farming operations" and, hence, could not be viewed as "incident to or in conjunction with" that activity. *Id.. See also Mitchell v. Budd,* 350 U.S. 473 (1956) (holding that farm employees engaged in "bulking" the farm's tobacco --a process by which dried tobacco leaves are stacked in bundles for fermentation -- were not engaged in secondary agriculture because, *inter alia,* bulking was not part of the farm's primary agricultural activity. It

10

occurred after the harvest and initial drying were over and was an activity that was "for the most part divorced from the *cultivation* of tobacco." 350 U.S. at 481 (emphasis added).

Moreover, even if an activity occurs at the same time as a farm's on-going primary agricultural operations, it is not secondary agriculture if it is not directly supportive of those operations. *See, e.g., Maneja,* 349 U.S. at 271-272 (workers who maintained and repaired the farm's village where its farmworkers lived were not performing agricultural work because their work did not have a "close and immediate tie to the process of production," *citing Kirschbaum Co. v. Walling,* 316 U.S. 517, 525 (1942));[5] *Osceola Farms,* 372 F.2d at 589-90 (flagmen who stopped traffic for truck drivers hauling cane from the field to the mill -- a primary agricultural activity -- were not exempt because their work "was a step removed from the actual physical operation of transport and they were removed from contact with the farm crop being transported").

Given these cases, the sub-contracting work that Plaintiffs performed -- erecting prefabricated metal and post-and-beam building shells, Fact 52 -- cannot be considered an established part of agriculture.  Construction work is not a primary agricultural activity like threshing wheat (e.g. harvesting), spraying insecticide (e.g. cultivating), or vaccinating chickens (raising poultry); it does not operate on crops or livestock at all. *See* Fact 53 (Plaintiffs never had contact with, or responsibility for the care of livestock being raised on the farms where they worked).  Nor was Plaintiffs' work directly and contemporaneously supportive of the livestock or poultry raising activity of the farms where they worked as <u>no</u> raising of livestock or poultry could occur in the buildings until after Signet Builders had finished its work on the building shell and

---

[5] The issue in *Kirschbaum* was whether the workers had a sufficiently close tie to production of goods for commerce to be covered by the FLSA.  In the context of *Maneja,* the Court was using the quote from *Kirschbaum* to indicate that the workers did not have a sufficiently close tie to the primary agricultural operations of the farm.

other contractors then completed the buildings. Fact 53.  Thus, like the chicken-catchers in *Holly Farms,* Signet Builders' construction work was separated in time from the farm's primary agricultural activity of raising livestock and poultry.  Plaintiffs work occurred before farming activity could start in the buildings while the chicken catchers work occurred after the farming activity in the chicken coops had ended but in neither case was the work part of a farm's farming activity. And like the work of the workers who maintained the farm housing in *Maneja*, Plaintiffs' work, while important and even necessary for the farms, had no "close and immediate tie" to the actual *raising* of livestock and poultry which only occurred after Plaintiffs' work was done. Therefore, consistent with the holding in *Holly Farms,* Plaintiffs work cannot be viewed as incident to or in conjunction with the actual farming operations of the farms where the buildings were built. 29 U.S.C. §203(f). *See Monterey Co. Bldg & Const. Trades,* 335 F.2d at 931 (comparing construction company workers *to Maneja's* non-exempt village maintenance workers).

The only tie between Plaintiffs' work and the primary agricultural activity of raising livestock or poultry was the fact that the buildings, once completed, were important for the successful operation of the farms.  But the Supreme Court has made clear that "the necessity of the activity to agriculture" does not make it agricultural. *Farmers Reservoir,* 337 U.S. at 761 ("The question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations.").  The connection between Signet Builder's subcontracting work and the *future* farming activity that could take place in those buildings is too attenuated for Signet Builders' work to constitute "an established part of agriculture." By any measure, it is an industrial/manufacturing operation like other construction work. Fact 71 (equipment and construction techniques are the same for on-farm and off-farm construction).  "The inclusion of industrial operations is not within

12

the intent of the definition in section 3(f), nor are processes that are more akin to manufacturing than to agriculture." 29 C.F.R. §780.129.

Signet Builders' inability to satisfy the "established part of agriculture" requirement -- the first of the Department of Labor's three requirements for work to be considered secondary agriculture -- is sufficient to grant summary judgment in favor of Plaintiffs and against Signet Builder's on its claim that it was performing secondary agriculture. Consideration of the other two factors only confirms that judgment.

### 2. Signet's Work Was Not Subordinate to the Farming Operations

DOL's second criterion, that the work be subordinate to the farming operations involved, cannot be satisfied either.  On all the projects where Plaintiffs worked, Signet Builders was hired either by Signet Construction, LLC or Signet Construction, Inc. to provide the labor necessary for those companies to fulfill their contracts. Fact 14, 20, 26, 32, 38. The scope of the work Signet Builders performed and the price it was paid for its work were dictated by the terms of its agreements with Signet Construction LLC and Signet Construction Inc. Fact 42 (Signet Builders was paid by Signet Construction LLC and Signet Construction Inc.). **Signet Builders, Inc. had no contract or business relationship with any general contractors or farm entities; its only business relation was with Signet Construction LLC or Signet Construction Inc., the construction contractors that hired Signet Builders and paid it.**[6] Fact 39.

---

[6]  Defendants may argue that all of the Signet companies should be treated as one and the same company. But they are separate corporations, Fact 6, and carried out separate functions on the projects at issue here. Signet Construction, Inc. and Signet Construction, LLC were the entities that entered into construction contracts for work on the projects.  They in turn hired Signet Builders, the entity that employed Plaintiffs and other H-2A workers, to provide the labor necessary to fulfill their contracts. Fact 14, 20, 26, 32, 38. Whether the Signet entities maintained these separate corporate forms and functions for tax purposes, to avoid liability, or for some other reason, they should not be permitted to change tact now that they find the use of separate corporate forms inconvenient.

13

In these circumstances, Signet Builders' work cannot be said to be subordinate to the farming operations that would eventually use the buildings it helped erect. If it was subordinate to anyone it was subordinate to the entities that hired it and paid it, Signet Construction, LLC and Signet Construction, Inc. **The Supreme Court made clear in *Holly Farms* that where an independent contractor has no business relationship with the farm on which it works, its work cannot be "incident to or in conjunction with" that farm's farming operations.** 517 U.S. at 402 (finding reasonable the NLRB's view that that "[b]ecause chicken catching crews have no business relationship with the independent farmers [who raise the chickens], . . . [their] activities were not incidental to the independent farmers' poultry raising operations."). **That holding, by itself, precludes Plaintiffs from being categorized as secondary agricultural workers.** Plaintiffs have found no cases, either before or after *Holly Farms* where an independent company with no contractual relationship with a farm was, nevertheless, found to be engaged in exempt secondary agricultural work. Where there is no contractual relationship with a farm, the work cannot be subordinate to the farming operations. *See also* 29 C.F.R. §780.143 ("The fact that a practice performed on a farm is not performed for the farmer is a strong indication that it is not performed in connection with the farming operations there conducted.").

Because Signet Builders work was not subordinate to farming operations it cannot satisfy the second of DOL's three requirements for its work to qualify as secondary agriculture. 29 C.F.R. §780.144.

### 3. Signet's Work Amounted to an Independent Business

The third criterion, whether Signet's work amounted to an independent business, was the criterion that the Seventh Circuit focused on in *Luna Vanegas,* 46 F.4th at 641-643. That criterion states:

The character of a practice as a part of the agricultural activity or as a distinct

14

business activity must be determined by examination and evaluation of all the relevant facts and circumstances in the light of the pertinent language and intent of the Act. The result will not depend on any mechanical application of isolated factors or tests. Rather, the total situation will control ... Thus, the general relationship, if any, of the practice to farming as evidenced by common understanding, competitive factors, and the prevalence of its performance by farmers (see § 780.146), and similar pertinent matters should be considered.

*Id.* at 642 *quoting* 29 C.F.R. § 780.145 (citing *Maneja v. Waialua Agric. Co.,* 349 U.S. 254, 264 (1955). To resolve whether Plaintiffs' work was part of the farm's "agricultural activity" or a "distinct business activity," the Seventh Circuit cited a number of factors drawn from DOL regulations, including (1) "whether the work Plaintiffs performed is 'ordinarily performed' by farmers or by independent businesses hired by those farmers;" (2) "whether Signet's construction contracts are in competition with agriculture or with industrial operations;" (3) "the division of labor and supervision between a contractor's employees and those of a farmer;" and (4) "similar pertinent matters." *Luna-Vanegas,* 46 F.4th at 643 (citing 29 C.F.R. §§ 780.145 & 780.146). These factors, considered in light of the undisputed evidence, clearly indicate that the work performed by Signet Builders was "a distinct business activity" and was not part of the farm's "agricultural activity."

(a) *Whether the work Plaintiffs performed is 'ordinarily performed' by farmers or by independent businesses hired by those farmers.* It is clear that the farms on which Plaintiffs worked did not engage in the kind of construction work performed by Signet Builders and the general contractors it worked for; that is, after all, why those farms hired independent construction companies to do the work. Facts 12-13 (Christensen Farms); 16-17 (Greenwillow Dairy); 22, 27

15

(Daybreak Foods); 34-35 (Natural Prairie Dairy).

It is equally clear that farmers do not 'ordinarily perform' construction work on large agricultural confinement buildings such as those that Signet Builders worked on. Facts 67-68 The size and complexity of modern pre-engineered livestock confinement buildings require professional engineering, dedicated construction crews, and specialized equipment that most farms do not have. *Id.* For that reason, it is far more economical for farms to rely on independent construction contractors when building large confinement structures. Fact 67-69. This is a prime example of the "economic progress" discussed in *Farmers Reservoir*, 337 U.S. at 760-761. The construction of farm structures has been "characterized by a progressive division of labor and separation of function" as confinement buildings have become larger and more complex. *Id.* Fact 65-69. In this way, construction of confinement buildings, "which are necessary to the total economic process of supplying an agricultural product become, in the process of economic development and specialization, separate and independent productive functions operating in conjunction with the agricultural function but no longer a part of it." *Id. See Monterey Co. Bldg & Const. Trades,* 335 F.2d at 931 ("The construction activity and the installation of the equipment, although necessary to the functioning of the poultry ranch, were done by organizations 'separately organized as an independent productive activity.'"). The proliferation of agricultural construction companies and farms' reliance on those companies supports the conclusion that Signet Builders was engaging in a "distinct business activity" -- construction -- and was not engaged in an agricultural activity. As the Seventh Circuit noted in *Luna Vanegas,* "[i]f farmers typically hire independent contractors such as Signet to build livestock enclosures, that would be a significant indication" that building those enclosures is not agricultural work within the meaning of section

16

3(f)." *Id.,* 46 F.4th at 643 [7]

(b) *Whether Signet's construction contracts are in competition with agriculture or with industrial operations* -- Signet Builders competed with other framing contractors, just as the contractors who hired Signet Builders competed with other contractors. Fact 58, 59. FBi Builders, one of the general contractors on projects where Plaintiffs worked, stated that it was unaware of any farmers that performed the kind of framing subcontracting that Signet performs. Fact 58. That Signet Builders competes with other contractors rather than farming operations further supports the conclusion that its work was a distinct business activity, not agricultural activity.[8] *Luna Vanegas,* 46 F.4th at 643 ("If a business's primary competitors are not farming operations, then work performed for that business is unlikely to fall within the agricultural exemption.").

(c) *Whether there is a division of labor and supervision between a contractor's employees and those of the farmer* -- The undisputed evidence demonstrates that there was a division of labor between Signet Builders work performed by Signet's employees and work performed by the farms' employees. All of the contracts entered into by Signet Construction, Inc.

---

[7] At least one of the large agribusiness farms where Signet Builders worked, Christensen Farms and Feedlots, appears to have acted as its own general contractor hiring sub-contractors to perform the various aspects of the construction such as concrete, framing, plumbing etc. Christensen had over 1000 employees, Fact 11, yet still subcontracted the framing work to Signet, and other work to other trades, demonstrating vividly how highly specialized the construction industry has become. As discussed below, there was a concrete division of labor between the farming operations and the actual construction work performed by independent construction companies. *See* Fact 68.
.
[8] Even if a large agri-business had an in-house construction crew, such a crew would not be competing with Signet Builders for jobs any more than *Maneja's* sugar mill was competing with independent mills for work. Such a crew works for its own farm; it does not compete for jobs on other farms. If such a crew did compete for jobs on other farms, it would be operating as a competing construction contractor not as a competing farm.

17

and Signet Construction, LLC required those entities to provide the labor necessary to carry out the scope of work set forth in their contracts. Fact 44. *See also* Fact 45 (FBi's subcontract with Summit Livestock to erect the Greenwillow dairy buildings required FBi to provide the labor to construct the structures; FBi hired Signet Construction LLC as a sub-contractor to assist FBi). The entities that commissioned the projects Plaintiffs worked on did not provide workers to Signet Builders. Fact 46.

The contracts under which Signet Builders provided labor also made clear that supervision of its workers was the responsibility of Signet or the general contractors and sub-contractors that hired it, not the farm owner or operator. *See* Fact 47. Signet Builders admits that its workers worked together as a unit and were "primarily supervised by Signet management and front-line supervisors." Fact 43, 48.

Two of the farms where Plaintiffs worked, Christensen and Daybreak, had employees who conducted regular job site meetings with the contractors, observed their work and performed walk-throughs to generate punch lists of things that the contractors needed to correct. Fact 49. They also monitored/directed contractors' compliance with bio-security requirements. Fact 49. However, those activities do not change the essential division of labor between the farms and the construction contractors: The farm employees' job in holding meetings and inspecting the contractors' work was to protect their employer's investment in the project by ensuring that it proceeded on schedule and according to plan. The contractors and subcontractors' jobs were, as their contracts specified, to provide the labor, skill, and supervision necessary to perform the scope of work assigned to them. There was no overlap in that division of labor: Farm employees

18

did not perform the work that the farms were paying the contractors and their subs to perform[9]

and the contractors and subs did not perform the oversight work that the Daybreak and

Chrisensen's project managers performed. That division of labor between monitoring by owners

and the scope of work performed by contractors exists in all construction projects, whether the

work occurs on a farm or off.  Even a homeowner hiring a contractor to remodel her house, will

observe the contractor's work, ask questions, make suggestions and generate punch lists of things

not done according to the contract. But just because she does those things does not mean that

there is no division of labor between her, as homeowner, and the contractors who are actually

performing the remodeling work.

The clear division of labor between the farm's monitoring of its investment and the

contractors' work performing their scope of work supports the conclusion that Signet Builders

was engaged in a distinct business activity rather than an agricultural activity.[10] *Luna Vanegas,*

---

[9]  Biosecurity requirements are just part of the scope of work that contractors agree to perform. That is clear from the fact that, where they apply, they are part of the work contract that the contractor signs. *See, e.g.* Ex. 18 (Henning/Signet Construction, Inc. contract) at Signet002830-31 (specifying that subcontractor is required to adhere to Henning's biosecurity policy); Ex. 25 (Christensen Farms/Signet Construction LLC contract) at Signet002639 (Christensen Farms bio-security policy) at Signet002612 ¶6.b. ("Contractor agrees to observe all biosecurity rules provided by owner to contractor" and contractor shall indemnify owner "for any violation of such rules.") Owners may monitor compliance with biosecurity, just as they monitor compliance with other contract requirements, but that does not change the fundamental division of labor.

[10]  Although the issue need not be decided here, there is a serious question whether the construction managers at Christensen and Daybreak, whose full-time job is overseeing construction projects and who do no farming, are themselves "agricultural employees" or whether they would be viewed more like the sugar mill managers or farm housing managers that were found to be non-agricultural workers in *Maneja.* If they are non-agricultural workers, then the fact that they oversee contractors and sub-contractors like Signet Builders is of no significance to the question of the status of those contractors and sub-contractors.  Even if they are viewed as agricultural workers, there is a clear division of labor between their work and the work of the contractors building the structures for the reasons explained above.

46 F.4th at 643 ("If a farm's employees do not assist with work performed by a contractor's workers, or if there is minimal overlap between a farmer's work and a construction crew's work, or if a contractors employees work as a unit independently from farmers, the logical implication is that the contractor's work does not fall within the section 3(f) exemption.") (citing *Holly Farms,* 517 U.S. at 403-04).

### (d) *Other Pertinent Factors*

*(i)* The organization of the construction projects on which Plaintiffs worked further confirms that Signet Builders' work was "separately organized as an independent productive activity." *Farmers Reservoir,* 337 U.S. at 761. The farms involved entered into contracts with contractors who, in turn, hired Signet Construction LLC or Signet Construction Inc. to perform a portion of the contractors work (or, in the case of Christensen Farms, the farm acted as its own general contractor hiring Signet Construction LLC and other sub-contractors to perform the tasks necessary to complete its projects). Signet Construction LLC and Inc. then hired Signet Builders to provide the labor for their sub-contracts. Fact 14, 20, 26, 32, 38. Signet Builders did the work and was paid the price that was set (or negotiated) with the level above it; neither the scope of its work nor the price it was paid were determined by the farm. Fact 40. Moreover, Signet Builders only knew the terms under which it was hired. It was none of Signet Builders' business what the contract terms were between the contractors above it. Fact 41. This hierarchical division of labor where each of the contractors, subcontractors, and sub-sub contractors worked for the level that hired it, and had no reason to know anything about the contractual agreements entered into by the companies above them confirms that these construction companies, including Signet Builders, were acting as, and treating each other as, independent construction businesses. *See* 29 C.F.R. §780.143 ("The fact that a practice performed

20

on a farm is not performed for the farmer is a strong indication that it is not performed in connection with the farming operations there conducted.").

(ii) None of the construction contractors that hired Signet Construction, LLC or Signet Construction, Inc. knew or cared whether they were working for actual 29 U.S.C. § 203(f) farms or even if the buildings they were building would be used for farming.[11] Fact 60. As these contractors candidly explained, it was none of their business to inquire into who would use a building after they were finished with their work, much less delve into the relationship between the commissioning entity and the end user.  For all they knew the commissioning entity could be planning to sell the building once it was completed.  They were paid to build a building and what the owner did with it afterwards was not their concern. Fact 60. Even Signet Builders saw no reason to ask if the entity commissioning a project was, itself, going to be the one who would use the building for farming. Fact 61.

The fact that the contractors under whom Signet worked did not care whether they were working for an actual farmer or even if the building would be used for farming strongly suggests that those contractors were engaged in an "independent productive activity" rather than agriculture. *Farmers Reservoir,* 337 U.S. at 761.  It also explains why two, and perhaps all three

---

[11] Simply because projects had the word "farm" or "dairy" in their names does not mean that they were being commissioned by farmers falling within the 29 U.S.C.§ 203(f) definition. The Supreme Court has repeatedly made clear that vertically integrated agricultural operations may or may not be "farmers" depending on how they are structured and what activities they are performing. For example, Holly Farms hatches chicks that it then ships to contract farmers to raise as "broilers," after which its chicken catchers haul the chickens to Holly's processing plant. *Holly Farms, Inc.,* 517 U.S. at 395. The Court concluded that *Holly Farms* was a farmer with respect to its hatchery operations, but not a "farmer" with respect to its broilers because "[w]hen an integrated poultry producer 'contracts with independent growers for the care and feeding of [its] chicks, [its] status as a farmer engaged in raising poultry ends with respect to those chicks.'" *Id,* at 301 (citing *Bayside Enterprises v. NLRB,* 429 U.S. 298, 302 n.9 (1977)).  And, as the Court made clear in *Holly Farms,* Holly was not a farmer with respect to the chicken catchers it hired.

of these contractors paid overtime to their workers on the jobs where Plaintiffs worked. Fact 62-62 (FBi and Ag Building Solutions paid overtime; Henning Cos.'s witness stated it would pay overtime if it had hourly employees on the job working more than 40 hours). *A fortiori,* Signet Builders as a sub-sub-contractor of those independent construction contractors must also be viewed as engaged in an "independent productive activity" rather than agriculture.

For all of the foregoing reasons, Plaintiffs' work for Signet Builders was (a) not "an established part of agriculture," (b) not "subordinate to the farming operations involved" and (c) was not performed as part of an agricultural activity but rather as an "independent business" engaged in construction contracting.  29 C.F.R. ¶780.144.  Signet Builders' inability to satisfy any one of those criteria, let alone all three, mandates the conclusion that Plaintiffs' work was not "incident to or in conjunction with [a farm's] farming operations," and therefore not exempt agricultural work. 29 U.S.C. §203(f).

**III.    Defendants' Sixth Affirmative Defense Cannot Be Supported.**

Defendants' Sixth Affirmative Defense asserts that Plaintiffs' FLSA claims are barred by Section 10 of the Portal-to-Portal Act which bars liability where an employer acted,

> in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the [Administrator of the Wage and Hour Division of the United States Department of Labor] or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged.

29 U.S.C. §259.  Pursuant to Rule 56(c)(1)(B) Plaintiffs move for summary judgment on this defense on the grounds that Defendants cannot present admissible evidence sufficient to create a fact issue supporting a 29 U.S.C. §259 defense. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a

22

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

**IV.  Plaintiffs Are Contractually Entitled to the Prevailing Wage for Non-Agricultural Construction Work.**

If the Court finds that Plaintiffs were not "employees employed in agriculture," Plaintiffs are entitled to summary judgment that they were contractually entitled to the OES prevailing wage for non-agricultural construction work.

Congress has authorized employers to obtain H-2A visas for foreign workers to perform temporary agricultural labor or services,[12] and H-2B visas for foreign workers to perform temporary non-agricultural services.  8 U.S.C. §1101(a)(15)(H)(ii)(a) & (b).  Employers may obtain such visas only  they first obtain a "temporary labor certification" from the Department of Labor certifying that the employment of such workers will not adversely affect the wages and working conditions of similarly employed U.S. workers. 8 U.S.C. §1188(a) (H-2A), 8 C.F.R. 214.2(h)(6)(iii) (H-2B).  DOL has adopted extensive regulations defining the minimum terms and conditions of work that employers must offer in order to obtain an H-2A or H-2B temporary labor certification.  *See* 20 C.F.R. §655 Part A (H-2B) and §655 Part B (H-2A).

Among the requirements for obtaining an H-2A employment certification that were in effect in 2018 and 2019, DOL required employers to file a "job order" on Form ETA-790 setting forth the terms and conditions of work being offered (also referred to as a "clearance order").  20 C.F.R. §655.121 (2010).  DOL regulations also required Signet Builders to provide each of its

---

[12] "Agricultural" for purposes of an H-2A visa is defined to include all work covered by the FLSA definitions of agriculture, 29 U.S.C. §203(f), and all work covered by the IRS definition of agriculture.  Defendants have admitted that Plaintiffs work did not fall within the IRS definition of agriculture. Fact 76.  Thus, if the Court finds that their work was non-agricultural for purposes of the FLSA, then it was non-agricultural for purposes of their H-2A visas.

workers with a work contract containing all of the information in the job order 20 C.F.R. §655.122(q) (2010). Signet complied with that requirement by providing a copy of the job order to each of its H-2A workers and it treated those job orders as the work contract between the workers and Signet. Fact 78.

All of Signet Builders 2018 and 2019 ETA-790 job orders contained an attachment entitled "20 CFR 653.501 Assurances" which stated:

> "The employer assures that all working conditions comply with applicable Federal and State minimum wage, child labor, social security, health and safety, farm labor contractor registration, *and other employment related laws*."

Fact 79 (emphasis added). Those ETA-790 job orders also contained an "ETA-790 Attachment" which set forth. the following contractual terms of work:

> **OTHER**
> The working conditions will comply with applicable Federal and State minimum wage, child labor, social security, health, safety, farm labor contractor registration and other employment related laws.

> and,

> **ASSURANCES AND OBLIGATIONS**
> The employer hereby provides written assurance that the employer agrees to follow all of the assurances and obligations set forth in 20 C.F.R. sec. 655.135.

Fact 80. The referenced assurances and obligations in 20 C.F.R. §655.135 (2010) state, *inter alia:*

> (e) *Compliance with applicable laws.* During the period of employment that is subject of the Application for Temporary Employment Certification, *the employer must comply with all applicable Federal, State, and local laws and regulations*, including health and safety laws. . .

20 C.F.R. §655.135 (emphasis added).

One of the reasons that DOL required employers to promise in their H-2A work contracts that they would comply with applicable employment-related laws is that DOL had a statutory obligation to ensure that workers admitted with H-2A visa were not employed at wages and

24

working conditions that would adversely affect the wages and working conditions of similarly employed U.S. workers. 8 USC §1188(a). DOL recognizes that some employers may employ H-2A workers "in an activity/activities not listed in the job order" or commit fraud in obtaining H-2Atemporary employment certification, 20 C.F.R. §655.182(d) (2010), and to ensure that such events do not adversely affect the wages of U.S. workers, DOL requires employers to promise in their contracts to comply with all applicable federal laws, including employment related laws. By including that language, DOL ensures that employers who receive H-2A visas and then employ the workers in non-agricultural jobs will not, even unintentionally, be allowed to undercut the wages of U.S. workers performing those non-agricultural jobs.

Among the federal employment-related regulations that Signet Builders contractually agreed to abide by is DOL's regulation at 20 C.F.R. §655.10(a) (2015) which provides that foreign visa workers performing *non*-agricultural work must be paid no less than the highest of the federal, state, or local minimum wage or the prevailing wage set by DOL. That wage is, by definition, the lowest wage that may be paid to temporary foreign visa workers performing construction work to avoid an adverse effect on the wages of similarly employed U.S. workers. The prevailing wage is defined by DOL as the "the arithmetic mean of the wages of workers similarly employed in the area of intended employment using the wage component of the BLS Occupational Employment Statistics Survey (OES)." 20 C.F.R. §655.10(b) (2015). Because, as will be seen below, the OES prevailing wage applicable to Plaintiffs' work is higher than the federal, state, and local minimum wages in the states where Plaintiffs worked, and higher than the wages actually paid to Plaintiffs,[13]

---

[13] Plaintiff Luna Vanegas was paid $16/hour for all of his work in 2018 and 2019. Plaintiff Garcia-Gonzalez was paid $13.54/hr in Wisconsin in 2019 and $13.26 in Indiana in 2019. Fact 83.

the OES prevailing wage is the wage that Signet's work contracts promised it would pay by virtue of its promise to comply with all "federal employment-related laws and regulations."

The OES prevailing wage applicable to the non-agricultural construction work Plaintiff Luna Vanegas performed in 2018 in Minnesota was $23.16/hr. and in Indiana was $18.02/hr. Fact 91.  The prevailing wage applicable to the non-agricultural construction work Plaintiffs performed in 2019 was $17.52 in Wisconsin and $21.49 in Indiana, later going up to $30.23 on November 15, 2019. Fact 92.  Because Signet Builders' work contracts agreed to comply with federal employment-related regulations, including those setting the minimum legal wage for non-agricultural work, Plaintiffs are entitled to summary judgment that they were contractually entitled to be paid these prevailing wages. *See Mencia v. Allred,* 808 F.3d 463, 472 (10th Cir. 2015) (worker could enforce the employer's promise in its H-2A work contract that it would comply with federal H-2A regulations to obtain the higher wage required by those rather than the rate set forth in his H-2A work contract).

V.    **Alternatively Plaintiffs Are Entitled to the Non-Agricultural Prevailing Wage in** *Quantum Meruit*

If the provisions of Plaintiffs' work contracts quoted above are not read to offer the federally mandated wage applicable to the non-agricultural work they performed--*i.e.* the OES prevailing wage --then the lower wage rate offered in their work contracts is void as against public policy.  Indeed, this Court has already ruled that if the wage rate offered in the contract is less than the minimum required by law, "the formal contract would not be enforceable and Luna Vanegas could recover in equity." Doc 107 at 11.  *See also Mencia,* 808 F.3d at 472 (when a contract lacks a lawful price term, *quantum meruit* may be used to substitute a reasonable price which must be at least as high as the lowest wage the worker could legally have been paid.); *Frederick County Fruit Growers,* 968 F.2d at 1272 (D.C. Cir. 1994) (where wage rate offered in H-2 workers' contracts

26

for the 1983 season was unlawful, workers were entitled to reasonable wages in *quantum meruit* equal to the lawful wage required by DOL regulations).  As explained above, the lowest lawful wage that could be paid to temporary foreign visa workers performing the non-agricultural construction work that Plaintiffs performed was the prevailing wage set by the OES survey. Fact 91, 92.

**VI.    Plaintiffs' Regular Rates for Purposes of Calculating Their FLSA Overtime Damages Are the Prevailing Rates Set Forth in Fact 83 & 84**

If the Court finds that Plaintiffs are entitled to the OES prevailing rates applicable to their non-agricultural work, whether as a matter of contract or *quantum meruit,* those prevailing rates should be treated as their regular rates for purposes of calculating their FLSA overtime damages. *See* 29 C.F.R. §778.5 ("Where a higher minimum wage than that set in the Fair Labor Standards Act is applicable to an employee by virtue of such other legislation, the regular rate of the employee, [used to determine FLSA overtime rates] cannot be lower than such applicable minimum, for the words 'regular rate at which he is employed' as used in section 7 must be construed to mean the regular rate at which he is lawfully employed.").

**CONCLUSION**

For all of the foregoing reasons, Plaintiffs are entitled to partial summary judgment (i) rejecting Defendants fourth affirmative defense and finding that the work they performed was non-agricultural construction work; (ii) rejecting Defendants Sixth affirmative defense for lack of evidence to support it; (iii) finding that Plaintiffs contract entitled them to the OES prevailing wages set forth in Facts 83 and 84, or, alternatively (iv) finding, that if their work contract did not offer the OES prevailing wage, the wage term in their work contract was void as against public policy entitling Plaintiffs to a reasonable wage in *quantum meruit,* which wage cannot be less than the lowest lawful wage for the work they performed -- i.e. the OES prevailing wages set forth in

Fact 91, 92, and (v). Plaintiffs are entitled to have their FLSA overtime damages calculated at time-and-one-half the applicable OES prevailing rates for all hours they worked over 40 (minus what they were paid for those hours) pursuant to 29 C.F.R. §778.5.

Respectfully submitted this 25th day of March, 2026.

**MARTIN & BONNETT, P.L.L.C.**

By: *s/ Daniel L. Bonnett*
Susan Martin
Daniel L. Bonnett
Jennifer Kroll
Michael M. Licata
4747 N. 32nd Street, Suite 185
Phoenix, AZ 85018
Tel: (602) 240-6900
dbonnett@martinbonnett.com
smartin@martinbonnett.com
jkroll@martinbonnett.com
mlicata@martinbonnett.com

Edward Tuddenham
228 W. 137th St.
New Yor, NY 10030
Tel: 646-261-2171
edwardtuddenham@gmail.com

David Zoeller
Hawks Quindel
409 E. Main St.
Madison, WI 53701
Tel: 608-257-0040
dzoeller@hq-law.com

*Attorneys for Plaintiffs*

28